IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 19, 2015 Session

**IN RE: SALIACE P., ET AL.**

**Direct Appeal from the Juvenile Court for Dyer County**
**No. 7117    Jason L. Hudson, Judge**

---

**No. W2015-01191-COA-R3-PT- Filed January 26, 2016**

---

This case involves the termination of a mother's parental rights to her three daughters. The children were previously adjudicated dependent and neglected due to physical abuse of the children by the mother's boyfriend. After the children were in foster care for about a year, the Department of Children's Services filed a petition to terminate the mother's parental rights on several grounds. The trial court found by clear and convincing evidence that three grounds for termination were proven and that termination was in the best interest of the children. The mother appeals. We affirm in part, reverse in part, and remand for further proceedings. We affirm the termination of the mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part, Reversed in part, and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN and KENNY ARMSTRONG, J.J., joined.

Martin E. Dunn, Dyersburg, Tennessee, for the appellant, Deana P.

Herbert H. Slatery III, Attorney General and Reporter and Kathryn A. Baker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I. FACTS & PROCEDURAL HISTORY**

Deana P.[1] ("Mother") and Scott M. ("Father") have three daughters – twin girls

---

[1]In cases involving minor children, it is this Court's policy to redact names in order to protect the children's identity. In this case, in order to preserve both clarity and the anonymity of the children, we will redact the names of individuals sharing the children's surname and will refer to those individuals by

born in July 2007 and a third daughter born in July 2008. The children were born in Florida, but Mother, Father, and the children subsequently moved to Tennessee. Mother and Father were unmarried and had a long history of domestic violence. They separated after moving to Tennessee, and the children resided with Mother in Dyersburg.

The Tennessee Department of Children's Services ("DCS") became involved with the children around October 2012, due to allegations that Mother's then-boyfriend ("Boyfriend") was physically abusing the children and Mother. In November 2012, the juvenile court of Dyer County entered a no-contact order providing that Boyfriend was to have no contact with the children. Boyfriend moved out of Mother's residence. DCS entered into a non-custodial permanency plan with Mother and provided her with utility assistance and in-home counseling services to address domestic violence and parenting issues from November 2012 until April 2013. Believing that Boyfriend was out of the picture, DCS closed its case in April 2013.

Unbeknownst to DCS, Boyfriend had resumed living with Mother and the children around January or February 2013. Mother would later admit that she was "actively hiding" her relationship with Boyfriend from the DCS caseworker who visited her home. Boyfriend continued to physically abuse Mother and the children. On June 25, 2013, DCS received a referral that Mother's youngest daughter had severe bruising on her leg and arm. According to DCS, caseworkers observed black and blue bruises four to five inches long that appeared to be from a belt, and the minor child reported that Boyfriend "got drunk and spanked me with a belt." The child's daycare reported observing additional bruises and revealed that Boyfriend signed the children in and out of daycare on several occasions. The children were removed from the home and placed in the protective custody of DCS on the afternoon of June 25. They were placed in a foster home with resource parents.

The following day, DCS filed a petition to adjudicate the children dependent and neglected due to the abuse by Boyfriend and Mother's willful violation of the no-contact order. Mother stipulated to the existence of clear and convincing evidence that the children were dependent and neglected, and the juvenile court adjudicated the children dependent and neglected on November 22, 2013. After a *de novo* appeal, the circuit court also found the children dependent and neglected.[2]

Meanwhile, DCS entered into a permanency plan with Mother on July 24, 2013, not long after they entered foster care. The plan's goal was that the children would be returned to Mother in six months. The plan listed numerous action steps for Mother, who

their given name and the first letter of their surname.

[2]Father was also a party to the proceedings, and he appealed the finding of dependency and neglect to circuit court. Mother appealed only as to the children's placement.

had recently failed a drug screen. She was required to pay $25 per month in child support for each child; attend supervised visits with the children; pass six consecutive drug screens; avoid drug users; complete an alcohol and drug assessment, a parenting assessment, and a mental health assessment, and follow their recommendations; maintain stable housing and financial stability for three months; and maintain contact with her caseworker. Mother signed the permanency plan indicating her agreement with its requirements and also signed a document informing her of the criteria and grounds for terminating parental rights.

Mother initially made some limited progress toward completing these tasks. She rented an apartment in Dyersburg where she lived alone, and she maintained steady employment at a fast food restaurant where she had worked for about two years. She had weekly supervised visits with the children. Mother went to a mental health center for an intake assessment and completed four sessions with a therapist. However, she lied about her drug use on her intake assessment. Mother was evicted from her apartment in September 2013 for unspecified reasons. After living with her sister for a short period, Mother moved to her hometown of Bradenton, Florida, in October 2013. Father and Boyfriend were also residing in Florida (separately) by that time. Mother obtained a restraining order against Boyfriend in Florida, but she maintained contact with Father. Mother reported to DCS (and later testified) that she resided with two different friends in Florida and babysat their children to avoid a rent obligation. She denied living with Father. However, in April 2014, Mother became involved with child protective services in Florida while babysitting a child at Father's residence. Mother failed a drug test and was admittedly using morphine. In May 2014, Father paid for Mother to obtain treatment at a mental health and addiction hospital, and records from the hospital indicate that Mother was living with Father at the time.

After a psychiatric evaluation at the Florida addiction hospital, Mother was diagnosed with opioid dependence and major depressive disorder. According to hospital records from May 2014, Mother reported using morphine daily, consuming one to two bags of heroin per day if she did not have morphine, and using "any other drug she could get her hands on." Mother reported "drug use at this intensity since October 2013 when her children were removed from her and placed in foster care." She also reported that she was last sober seven years ago when she was pregnant. She reported one previous suicide attempt by overdose. Mother was prescribed medication, and she participated in some detoxification treatment and group therapy for a few months at the Florida facility, but she never completed the program and subsequently relapsed. Throughout this time, Mother consistently returned to Tennessee with Father for supervised visitation with the children once a month.[3] She also completed a parenting class in Florida. However, she

---

[3]DCS gave gas cards to Father to help with the cost of transportation.

failed a drug screen administered by DCS, testing positive for methamphetamine, cocaine, and morphine.

On June 6, 2014, DCS filed a petition in the juvenile court of Dyer County to terminate Mother's parental rights. By that time, the twins were age six, and the youngest daughter was age five. They had been residing with the same foster parents since their removal from Mother's home in June 2013. The petition noted that the children had been adjudicated dependent and neglected. It alleged several statutory grounds for termination of Mother's parental rights – abandonment by willful failure to pay child support; abandonment by failure to provide a suitable home; substantial noncompliance with a permanency plan; and persistent conditions since removal from the home. The petition also alleged that it was in the best interest of the children to terminate Mother's parental rights. The juvenile court appointed counsel for Mother and appointed a guardian ad litem for the children. Mother moved back to Tennessee in December 2014. She resumed weekly supervised visitation with the children and began working at a temporary employment agency.

The termination case was heard on May 8, 2015. The trial court heard testimony from Mother, Father, two DCS caseworkers, two counselors who supervised Mother's visitation, a counselor from a mental health center, the foster mother, and Mother's sister. On May 29, 2015, the trial court entered a final order terminating Mother's parental rights on three grounds – abandonment by willful failure to support, abandonment by failure to establish a suitable home, and substantial noncompliance with a permanency plan. The trial court also found by clear and convincing evidence that termination was in the best interest of the children. Mother timely filed a notice of appeal. Father did not appeal.

## II. ISSUES PRESENTED

Mother presents the following issues, as slightly reworded, for review on appeal:

1.     Whether the record contains clear and convincing evidence to support the trial court's termination of Mother's parental rights on the grounds of (1) abandonment by willful failure to support; (2) abandonment by failure to provide a suitable home; and (3) substantial noncompliance with the permanency plan; and

2.     Whether the record contains clear and convincing evidence to support the trial court's finding that termination was in the children's best interest.

4

In its posture as appellee, DCS presents the following additional issue, as slightly reworded, for review:

> 3.  Whether the juvenile court erred by failing to terminate Mother's parental rights on the ground of persistent conditions.

For the following reasons, we affirm the decision of the juvenile court in part, we reverse in part, and we remand for further proceedings.

## III. STANDARD OF REVIEW

A biological parent's right to the care and custody of his or her child is a right that is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions. *In re Kaliyah S.*, 455 S.W.3d 533, 540 (Tenn. 2015) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *In re Giorgianna H.*, 205 S.W.3d 508, 515 (Tenn. Ct. App. 2006)). Although the parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute. *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007). A parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.* (citing *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002)).

In Tennessee, proceedings to terminate a parent's parental rights are governed by statute. *In re Kaliyah S.*, 455 S.W.3d at 541. "Parties who have standing to seek the termination of a biological parent's parental rights must prove two things." *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005); *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). First, they must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Several grounds for termination are listed in subsection (g), but the existence of any one of the grounds enumerated in the statute will support a decision to terminate parental rights. *In re Angela E.*, 303 S.W.3d 240, 251 (Tenn. 2010). Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Audrey S.*, 182 S.W.3d at 860. "In light of the constitutional dimension of the rights at stake in a termination proceeding . . . , the persons seeking to terminate these rights must prove all the elements of the case by clear and convincing evidence." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). "Clear and convincing evidence" has been defined as "evidence in which there is

no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (citing *In re Valentine*, 79 S.W.3d at 546). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Audrey S.*, 182 S.W.3d at 861.

In sum, in order to terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination, but also that termination is in the child's best interest. *In re Adoption of Angela E.*, 402 S.W.3d at 639; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). Because of this heightened burden of proof in parental termination cases, on appeal we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). *In re Audrey S.*, 182 S.W.3d at 861. First, we review each of the trial court's specific factual findings *de novo* in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. *In re Adoption of Angela E.*, 402 S.W.3d at 639. Second, we must determine whether the facts (either as found by the trial court or as supported by the preponderance of the evidence) amount to clear and convincing evidence that one of the statutory grounds for termination exists. *Id.* at 639-40. Whether a statutory ground has been proven by the requisite standard of evidence is a question of law to be reviewed *de novo* with no presumption of correctness. *In re R.L.F.*, 278 S.W.3d 305, 312 (Tenn. Ct. App. 2008).

## IV. DISCUSSION

### *A. Grounds for Termination*

### 1. Abandonment by Willful Failure to Support

The first ground for termination listed in the termination statute is abandonment. Tenn. Code Ann. § 36-1-113(g)(1). For purposes of terminating parental rights, there are five alternative definitions of abandonment listed in Tennessee Code Annotated section 36-1-102(1)(A)(i)-(v). According to the first definition, "abandonment" means:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents . . .

6

> either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i). "Abandonment can be established by showing that a parent *either* willfully failed to visit *or* willfully failed to support the child during the relevant time period." *In re Christopher M.*, No. W2010-01410-COA-R3-PT, 2010 WL 4273822, at *10 (Tenn. Ct. App. Nov. 1, 2010) (citing *In re Adoption of McCrone*, No. W2001-02795-COA-R3-CV, 2003 WL 21729434, at *10 (Tenn. Ct. App. July 21, 2003)). This case only involves allegations of willful failure to support.

The parent's willful failure to support "or make reasonable payments toward the support of the child must have occurred in the four months immediately preceding the filing of the termination petition currently before the court." *In re D.L.B.*, 118 S.W.3d 360, 366 (Tenn. 2003). Here, Mother indisputably did not pay child support during the relevant four month period. In fact, she has never paid child support for the children. The pivotal issue on appeal regarding Mother's failure to pay child support is whether her actions were willful.

The element of willfulness is essential and central to the determination of abandonment. *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005); *In re C.M.C.*, No. E2005-00328-COA-R3-PT, 2005 WL 1827855, at *6 (Tenn. Ct. App. Aug. 3, 2005). It is both a statutory and a constitutional requirement. *In re Adoption of Kleshinski*, No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at *18 (Tenn. Ct. App. May 4, 2005). Willfulness in the context of termination proceedings does not require the same standard of culpability as is required by the penal code, nor does it require that the parent acted with malice or ill will. *In re Audrey S.*, 182 S.W.3d at 863; *see also In re S.M.*, 149 S.W.3d 632, 642 (Tenn. Ct. App. 2004). Rather, a parent's conduct must have been willful in the sense that it consisted of intentional or voluntary conduct rather than accidental or inadvertent acts. *In re Audrey S.*, 182 S.W.3d at 863. To prove the ground of abandonment, a petitioner must establish by clear and convincing evidence that a parent who failed to support had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so. *In re Adoption of Angela E.*, 402 S.W.3d at 640.

Triers-of-fact lack the ability to peer into a parent's mind to assess intentions or motivations and must infer intent from circumstantial evidence, including the parent's actions or conduct. *In re Audrey S.*, 182 S.W.3d at 864. Whether a parent failed to support a child is a question of fact, but whether a parent's failure to support constitutes willful abandonment is a question of law. *In re Adoption of Angela E.*, 402 S.W.3d at

7

640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). This Court reviews questions of law *de novo* with no presumption of correctness. *Id.*

DCS filed the petition to terminate Mother's parental rights on June 6, 2014, so we must consider whether Mother willfully failed to support the children during the four-month period immediately preceding the filing of the petition. Mother was residing in Florida at that time. She quit her job at the fast food restaurant in Dyersburg when she left Tennessee in October 2013. At trial, Mother testified that she moved to Florida after she was evicted from her apartment in Tennessee because she had a better support system in Florida, including her mother and father and her childhood friends with whom she lived after moving. Mother had only a high school education. She testified that she "sporadically" worked "side jobs" during the fourteen months that she resided in Florida. She explained that she "did babysitting jobs" for her friends in order to avoid paying rent to live with them, but she "wasn't really making the money." Mother said she applied for work at more than a dozen locations such as restaurants and convenience stores, and she had some interviews, but no one would hire her because of her criminal record for petty theft and domestic assault.[4] Mother testified that the only steady job she held was detailing classic cars for an individual for six weeks, earning $5.50 an hour and working at most 25 hours a week. However, she did not specify when she held this job. Mother testified that she had no other steady work while in Florida. She also testified that she owned no significant assets aside from a one-half interest in a 1999 Ford Explorer that she purchased with a friend. She began receiving food stamps in Florida in March 2014, about three months before the termination petition was filed. Mother admitted to using drugs while in Florida but testified, "I was not paying for them. People that I knew just felt sorry for me."

This evidence does not clearly and convincingly establish that Mother had the capacity to pay child support during the relevant four-month period and failed to do so without a justifiable excuse. DCS points to Mother's limited expenses while living in Florida, due to her receipt of food stamps and the absence of a rent payment. However, the record is devoid of evidence that Mother earned *any* income during the relevant four-month period. The burden to prove abandonment by willful failure to support rests with DCS. Having thoroughly reviewed the entire record, we conclude that DCS failed to present sufficient evidence to eliminate any "serious or substantial doubt" about whether Mother's failure to support the children was willful. *In re Adoption of Angela E.*, 402 S.W.3d at 640. Finding no clear and convincing evidence that Mother had the capacity to pay child support during the relevant four month period, we vacate the trial court's finding of abandonment for willful failure to support. However, because only one ground

---

[4]Mother was convicted of domestic assault in 2011 for dragging Father with her vehicle.

for termination must exist in order to terminate parental rights, we proceed to consider the other grounds asserted.

### 2.    Abandonment by Failure to Provide a Suitable Home

The second definition of abandonment that is relevant to this appeal provides that abandonment occurs when:

> (ii) The child has been removed from the home of the parent . . . as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but that the parent or parents . . . have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent . . . toward the same goal, when the parent . . . is aware that the child is in the custody of the department[.]

Tennessee Code Annotated section 36-1-102(1)(A)(ii).

For purposes of the statute, a "suitable home" means more than just an adequate physical space. *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *8 (Tenn. Ct. App. Apr. 27, 2015) (*no perm. app. filed*); *In re Malaki E.*, No. M2014-01182-COA-R3-PT, 2015 WL 1384652, at *9 (Tenn. Ct. App. Mar. 23, 2015) (*no perm. app. filed*). "A suitable home for purposes of termination of parental rights is not merely a solidly built structure." *In re Jonathan F.*, No. E2014-01181-COA-R3-PT, 2015 WL 739638, at *12 (Tenn. Ct. App. Feb. 20, 2015). A suitable home requires a safe and stable environment in which a child can live, *id.*, and "the presence of a care giver who

can supply the care and attention a child needs." *In re Malaki E.*, 2015 WL 1384652, at *9. A suitable home must be free from drugs and domestic violence. *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014) *perm. app. denied* (Tenn. Sept. 2, 2014).

The evidence in the record supports the trial court's finding that Mother has failed to make reasonable efforts to provide a suitable home for the children, and she has demonstrated a lack of concern for the children to such a degree that it appears unlikely that she will be able to provide a suitable home for the children at an early date. At trial, Mother was asked, "Is there anything you can think of that [your caseworkers] could have done to help you get your kids back quicker?" She responded, "No." However, on appeal, Mother argues that DCS failed to use reasonable efforts to assist her with her drug problem because DCS did not obtain her treatment records from the Florida addiction hospital and provide them to the mental health professional on staff at DCS in order to formulate a plan for her. Mother's original caseworker testified that she obtained a release from Mother, called the Florida facility, and faxed the release to them with a request for the records, but she never received them. Mother's second caseworker testified that she called the facility a couple of times and also sent the release in order to obtain the records, but she never received the requested documentation either. DCS's efforts were reasonable in this regard.[5] We affirm the trial court's finding that this ground for termination was proven by clear and convincing evidence.

### 3. Substantial Noncompliance with the Permanency Plan

The next ground alleged in the termination petition is found in Tennessee Code Annotated section 36-1-113(g)(2) and applies when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4." Tenn. Code Ann. § 36-1-113(g)(2). As clearly stated in the statute, in order for a parent's noncompliance to justify the termination of parental rights, it must be "substantial." *In re Angel S.F.*, No. M2012-02089-COA-R3-PT, 2013 WL 1136551, at *5 (Tenn. Ct. App. Mar. 18, 2013) (citing *In re S.H.*, No. M2007-01718-COA-R3-PT, 2008 WL 1901118, at *7 (Tenn. Ct. App. Apr. 30, 2008)). Terminating parental rights based on this ground "requires more proof than that a parent has not complied with every jot and tittle of the permanency

---

[5]We note that this ground for termination focuses on DCS's efforts in the four month period following removal. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii); *In re Roger T.*, 2015 WL 1897696, at *8. Mother did not begin her treatment at the Florida addiction hospital until much later. However, for the sake of argument, we have considered the substance of Mother's argument regarding the adequacy of DCS's efforts.

plan." *In re M.J.B.*, 140 S.W.3d at 656. Rather, DCS must demonstrate that the parent's noncompliance is substantial, considering "the degree of noncompliance and the importance of the particular requirement that has not been met." *Id.* "Substantial" means "of real worth and importance." *In re Valentine*, 79 S.W.3d at 548 (quoting *Black's Law Dictionary* 1428 (6th ed. 1990)). "'Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance.'" *In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at *14 (Tenn. Ct. App. Sept. 14, 2012) (quoting *In re K.E.R.*, No. M2006-00255-COA-R3-PT, 2006 WL 2252746, at *5 (Tenn. Ct. App. Aug. 3, 2006)). Additionally, a parent's "[i]mprovement toward compliance should be considered in a parent's favor." *In re Valentine*, 79 S.W.3d at 549 (citing *State Dep't of Human Servs. v. Defriece*, 937 S.W.2d 954, 961 (Tenn. Ct. App.1996)).

Again, the July 24, 2013 permanency plan that was entered after the children were placed in foster care stated a goal of returning the children to Mother in six months.[6] It listed numerous action steps for Mother, and she made attempts to comply with some of these responsibilities. Mother was required to attend supervised visits with the children, and she consistently did so throughout their time in foster care. Although Mother was scheduled to visit less frequently after moving to Florida, Mother's caseworkers testified that she missed only 7 out of 53 scheduled visits.

The plan also required Mother to obtain mental health and alcohol and drug assessments and to follow their recommendations. Before moving to Florida, Mother completed a mental health intake and completed four sessions with a therapist. However, her case worker testified that Mother lied on the intake form by denying any drug use. Six to eight months after moving to Florida, Mother sought treatment at the addiction hospital. Mother took medication and attended sessions for somewhere between two and six months, but she was unable to maintain sobriety. Mother testified at trial, "I would stay clean for weeks at a time and then fall off for a week and then get back on the wagon." Despite these struggles, a July 2014 record from the hospital indicates that Mother did not want to attend detox and was only interested in outpatient services. She eventually quit the program and her medication around September 2014. Mother returned to Tennessee in December 2014 and went several more months without any treatment. On or about April 24, 2015, shortly before the May 8 termination trial, Mother had an intake at a local counseling center in Dyersburg and attended one session. In sum, during the period of almost two years that the children were in DCS custody, Mother

---

[6] A total of six permanency plans were developed for Mother during the period in question, but Mother's responsibilities under the plans were substantially the same. The goal of the permanency plan was changed to adoption in April 2014.

failed to complete any treatment plan recommended by her providers. She also failed to comply with the plan's requirement that she pass six consecutive drug screens and avoid other drug users.

Mother completed a parenting class while in Florida; however, she generally failed to comply with the other requirements of the permanency plan. Although the permanency plans required her to pay $25 per month per child, she never paid child support for her children. She failed to maintain stable housing and financial stability, as Mother resided at six different locations in less than two years and was residing with a friend at the time of trial. She quit her stable job at the fast food restaurant in order to move to Florida, and while there she only worked one steady job, which was part-time for six weeks. Mother also failed to maintain contact with her caseworker. Mother was even asked at trial, "So what have you accomplished as far as providing a safe home for your children in order to get them back?" She responded, "Not too much."

Considering all the circumstances, clear and convincing evidence exists that Mother's noncompliance with the permanency plan was in fact substantial. The plan's requirements that Mother obtain mental health and drug treatment, stable housing, and financial stability were of utmost importance in this case, yet Mother failed to complete any of those tasks. We therefore affirm the trial court's finding that grounds for termination exist due to substantial noncompliance with a permanency plan.

### 4. Persistent Conditions

On appeal, DCS argues that the trial court should have also terminated Mother's parental rights on the ground of persistent conditions. The trial court mentioned in its lengthy final order that this was one of the four grounds alleged in the termination petition. However, in the analysis section of the order, the trial court simply stated that DCS had proven three grounds for termination, without any explanation of its findings regarding the fourth ground, which was persistent conditions. Thus, it is not clear from the order why the trial court concluded that the fourth ground was not proven.

The statutory ground for termination that is commonly referred to as "persistent conditions" is defined in Tennessee Code Annotated section 36-1-113(g)(3) as existing when:

The child has been removed from the home of the parent or guardian by

12

order of a court for a period of six (6) months and:

      (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

      (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

      (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

In order to terminate parental rights, each of the aforementioned elements must be proven by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550. The purpose behind the "persistent conditions" ground is "'to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.'" *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)). In cases involving this ground, it is not necessary to prove that a parent-child relationship cannot be salvaged, nor is it necessary to show that a parent is currently harmful to a child's safety or future emotional stability. *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000). The statutes governing termination of parental rights recognize a child's need for a permanent, stable environment. *Id.* Accordingly, the question is the likelihood that the child can be safely returned to the custody of the parent, not whether the child can safely remain in foster care with periodic visits with the parent. *Id.* When analyzing this ground for termination, we focus on "the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *In re Audrey S.*, 182 S.W.3d at 874.

      Each of the necessary elements was proven in the present case. The children were removed from Mother's home by order of a court for a period far in excess of six months. Although the children were removed due to physical abuse by Boyfriend, and he is no longer in contact with Mother, other conditions exist that in all reasonable probability would cause the children to be subjected to further abuse or neglect and therefore prevent the children's safe return to Mother's care. Mother continues her relationship with Father despite their long history of domestic violence. She has not completed a drug treatment plan or demonstrated that she can remain drug-free for any appreciable period of time. At trial, she admitted to using methamphetamine and morphine just three months earlier.

13

Mother also has unresolved mental health issues and has not demonstrated that she has a safe and stable home for the children. These facts produce a firm belief or conviction in our mind that the children would probably be subjected to further abuse or neglect. Unfortunately, given Mother's progress over the last few years, these conditions are unlikely to be remedied at an early date so that the children can be safely returned to Mother in the near future. At the termination trial, Mother admitted that she was not currently in a position to care for the children and that she would need at least four to five months, in her estimation, before she would be prepared to have custody of her children. In contrast, her caseworker estimated that it would take at least a year for Mother to demonstrate that she had made a substantial change in her life if she completed a drug treatment program and maintained her sobriety for an extended period without another relapse. She also explained that, aside from drug treatment, Mother would need to obtain suitable housing and demonstrate an ability to provide for the children. The caseworker noted that DCS had already been working with Mother for approximately two years since the children were removed from her home, in addition to the period of time that DCS assisted Mother pursuant to the noncustodial plan prior to removal. During that time, DCS provided Mother with in-home counseling regarding domestic violence and parenting issues. Still, at the time of trial, Mother remained in a relationship plagued by domestic violence, she was in need of drug treatment and mental health treatment, and she lacked a suitable home. We conclude that continuing the parent-child relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home. This ground for termination was also proven by clear and convincing evidence.

### B.    Best Interest

Finally, we address Mother's contention that terminating her parental rights was not in the children's best interest. Tennessee Code Annotated section 36-1-113(i) provides a list of factors that are relevant when deciding what is in a child's best interest. However, the list is not exhaustive. In addition, "the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest." *In re Arteria H*., 326 S.W.3d 167, 182 (Tenn. Ct. App. 2010). "The best interest of a child must be determined from the child's perspective and not the parent's." *Id.* (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)). "[W]hen the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-101(d)).

Like the trial court, we conclude that the evidence clearly and convincingly

establishes that it is in the best interest of the children for Mother's parental rights to be terminated. By all accounts, Mother's supervised visits with the children went well overall, but they were not without incident. During one visit, the children discovered a hypodermic needle in Mother's purse. During others, Father and Mother had contact during the visits despite instructions that they were to visit separately due to their history of domestic violence. On another occasion, during a supervised visit with Father shortly before trial, the children vividly described an incident in which he physically abused Mother. The supervisor testified that the children were "obviously still traumatized" by what they witnessed.

By the time of trial, the children were ages seven and six, and they had been residing with their foster parents for nearly two years. The foster mother testified that she and her husband loved the children as their own and would surely want to adopt them if the opportunity arose. She testified that the children still have problems with nightmares and participate in play therapy but have improved since they came into custody.

The statutory best interest factors weigh heavily in favor of terminating Mother's parental rights. Mother has not made such an adjustment in her circumstances so that it is safe and in the children's best interest to return to her home. She has failed to effect a lasting adjustment, despite reasonable efforts by DCS, for such a duration of time that lasting adjustment does not reasonably appear possible. She has maintained visitation with the children but has had no unsupervised visitation since they entered DCS custody. Changing caretakers at some point in the future is likely to have a detrimental effect on the children's emotional and psychological condition. Mother has in the past failed to protect the children from physical abuse by her paramour, as she admitted at trial that she allowed a known child abuser to move back into her home with the children and actively hid him from DCS. Although that particular paramour is no longer around, Mother remains in a relationship that has a long history of domestic violence. Mother was residing with a friend at the time of trial and did not have a safe and suitable home for the children. She has not shown that she is able to abstain from the use of drugs such as methamphetamine and morphine. She was diagnosed with major depressive disorder and opioid dependence less than a year before trial but failed to complete the recommended treatment. Finally, Mother has never paid child support for any of the children. *See* Tenn. Code Ann. § 36-1-113(i).

## V. CONCLUSION

For the aforementioned reasons, the decision of the juvenile court is hereby affirmed in part, reversed in part, and remanded for further proceedings. Costs of this

appeal are taxed to the appellant, Deana P.  Because Deana P. is proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.

_____
BRANDON O. GIBSON, JUDGE
